**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JAMES D. HINSON ELECTRICAL
CONTRACTING Co., INC., Individually and
On Behalf of All Others Similarly Situated,

        Plaintiff,

vs.                            Case No. 3:07-cv-598-J-32MCR

BELLSOUTH TELECOMMUNICATIONS,
INC.,

        Defendant.

---

## ORDER

    This case is before the Court on Defendant BellSouth Telecommunications Inc.'s (BellSouth) motions for summary judgment, (Docs. 46, 62), Plaintiff James D. Hinson Electrical Contracting Co., Inc.'s (Hinson) responses, (Docs. 76, 78), Hinson's Motion for Partial Summary Judgment (Doc. 64) BellSouth's Response (Doc. 74) and BellSouth's Reply. (Doc. 84.) The Court heard oral argument on these motions May 12, 2009, the record of which is incorporated by reference.

    The Florida Underground Facility Damage Prevention and Safety Act, § 556.101, Florida Statutes ("Damage Prevention Act" or "the Act") was enacted in part to "aid the public by preventing injury to persons or property and the interruption of services resulting from damage to an underground facility caused by excavation or

demolition operations." Fla. Stat. § 556.101. The Act requires that excavators give advance notice of their activities so member operators[1] can mark the locations of their underground lines and prevent accidental excavation damage to those lines. If damage nonetheless occurs despite the lines being properly marked, the statute creates a rebuttable presumption of negligence and the excavator is liable "for the total sum of the losses to all member operators involved as those costs are normally computed." Fla. Stat. § 556.106. The current posture of this case requires the Court to interpret this portion of the statute and determine whether BellSouth, as a matter of law, is entitled to recover general overhead and a claims processing charge pursuant to the statute.

## I. Facts

The facts are largely undisputed. Hinson is an excavator that severed an underground cable owned by BellSouth in March 2003. BellSouth repaired the cable and sent a damage claim invoice to Hinson. After Hinson questioned the amount, BellSouth sent a revised bill, which Hinson paid. Hinson now alleges that BellSouth improperly included markups for claims processing and corporate overhead expenses without disclosing this to Hinson. BellSouth asserts that these charges are proper under the Act. After denying BellSouth's motion to dismiss (Doc. 33), the undersigned

---

[1] The statute defines member operator as "any person who furnishes or transports materials or services by means of an underground facility." Fla. Stat. § 556.102(8).

2

decided to test the efficacy of plaintiff's legal theories through merits discovery and dispositive motion practice before entertaining a class certification motion. Through discovery, more details regarding BellSouth's billing practices have come to light.

The first bill sent by BellSouth for the damage caused by Hinson totaled $3640.92, an amount that Hinson disputed. (Allen Aff. ¶¶ 19-22.) The record implies (although this may be a disputed fact), that BellSouth mistakenly billed Hinson for five extra days of work that were actually the result of a contractor's delay. (Id.) In any event, BellSouth removed the disputed charges and sent Hinson a revised bill of $1934.49. (Doc. 24-2 at 2.) Hinson paid that bill in full. (Allen Aff. ¶¶ 19-22.) That document is reproduced on the next page.

# ⊚ *BELL*SOUTH

Forward Payment To

Claims Bureau
Room 36A86
675 W Peachtree Street, N E
Atlanta, Georgia 30375
(404) 230-2074
888-662-2004

| | |
|---|---|
| | Claim Number **FEF0403-090079** |
| James D. Hinson Electrical Contr. Co. | Bill Number **FDP0304450** |
| Chris Ginn | |
| 11609 W Columbia Park Drive | Date of Bill **June 19, 2003** |
| Jacksonville, FL 32258-2480 | |
| | Total Amt Due **$1,934.49** |

(Please return this portion with your payment)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Claim Number **FEF0403-090079**    Bill Number **FDP0304450**    Date of Bill **June 19, 2003**

This bill is for damage which occurred on March 20, 2003 at
Normandy and Fouraker, Jacksonville FL

How Damage Occurred:
  600 pair cable cut while placing conduits

Cost to Repair:

| | Hours | |
|---|---|---|
| Labor Cost: | | |
|   FACILITY TECHNICIAN | 15.00 | 967.97 |
| Material Cost: | Quantity | |
|   CLAMP BOND B SIZE 3 | 0.20 | 1.36 |
|   HARNESS CA REHAB 25PR 22GA 24" | 6.00 | 275.30 |
|   MARKER BALL EMS TEL 4" | 1.00 | 6.06 |
|   TAPE VINYL G   3/4"X 6' BK | 0.40 | 1.23 |
| Other: | Quantity | |
|   Contractor - Signs | | 682.57 |

JUN 2 3 2003

For questions regarding this bill contact Teresa Watson
at (404) 230-2136.

You may contact the BellSouth Claims office at no charge on
1-888-662-2004.  Pursuant to Florida Law, Statue 627.4137, please
disclose to us the name of each known insurer which may be liable on
account of this claim.

Please Forward Payment By July 19, 2003        Total Amt Due $     1,934.49

RF-6178
(03-2003)

(Doc. 24-2 at 2.)

The amounts charged to Hinson included both direct and indirect costs. Two categories of "indirect costs" are not challenged by Hinson. First, the Labor Cost of BellSouth's Facility Technician is a blended rate that BellSouth computes by adding the hourly wage of the technician to indirect "Labor benefit" and "Labor support" costs. (Doc. 54-4.) BellSouth's "Labor support" charges include expenses for three levels of supervision, clerical support, support staff, vehicles and other tools and equipment, (id.), while the "Labor benefit" costs include costs for insurance, medical plans, social security and unemployment payroll taxes. (Id.) Second, BellSouth adds on a five percent "supply expense" to the actual cost of materials used to repair the damage. (Doc. 68-5 at 7.) This charge represents the indirect costs associated with stocking, tracking and transporting materials. (Id.)

The charges Hinson does contest are BellSouth's "Corporate Overhead" and "Claims Processing" expenses. First assessed to damage repair claims in 1998, the Corporate Overhead expense is applied as a percentage amount to labor charges, materials and third-party contractors. This expense consists of costs from two categories, Corporate Operations and Investment Related Costs. (Doc. 68-2 at 11.) Corporate Operations supports nine specific cost accounts: Executive, Planning, Accounting and Finance, External Relations, Information Management, Human

Resources, Legal, Procurement, and Other General and Administrative. (Id.)

Investment Related Costs include six specific cost accounts: Return on investment,

Gross up for Income Taxes, Property Taxes, Capital Stock Taxes,

Depreciation/Amortization Expense and Plant Specific Operations Expense. (Id.)

The Corporate Overhead expense was approximately twenty percent on the 2003

Hinson bill.

The Claims Processing expense was first assessed in November 2001. A

memorandum sent by Charles Ginn, former director of Security Staff/Claims for

BellSouth, explained why the charge was added:

> Whenever a cable is cut . . . or other types of plant facility damages occur, BellSouth incurs the cost of investigating and processing these damages in addition to the cost of repairing/replacing the damaged facilities. In order to be made whole from such damages and avoid having to pass these investigative/processing costs on to our customers, we will pursue recovery of these costs in addition to the costs of repairing/replacing the damaged facilities. A pro-rated amount of the total cost of our claims personnel, who are directly involved in handling plant facility damages, will now be included in each plant facility damage bill.

(Doc. 64-11.) While Ginn originally believed that the "corporate overhead" expense

would be immediately reduced to reflect the reduction of the newly added "claims

processing" expense, this did not occur until April 1, 2003. (Ginn Dep. 17:6-22, June

27, 2008.) In 2003, the Claims Processing expense was approximately twenty

percent.[2]  (Doc. 64-9 at 2.)

## II.  Legal Standard

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine material, factual dispute."  Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotations omitted).  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor.  Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005).

---

[2] For each charge, BellSouth assessed the Corporate Overhead markup, reached a new sum total, and then assessed the twenty percent Claims Processing markup to the new amount to reach the final amount billed.  While the parties have not proffered a precise numerical amount to the Court, this practice provides BellSouth with an approximate markup of forty percent over the bill without those assessments. (It is not clear how the agreed to reduction on Hinson's bill affected these numbers).

### III. Discussion

#### a. Liability under the Act

Hinson's liability under the Act is for "the total sum of the losses . . . as those costs are normally computed." The parties have filed cross-motions for summary judgment on the issue of whether the Corporate Overhead and Claims Processing expenses charged by BellSouth are permissible under the Act. Their arguments seem to rest on differing points of emphasis; BellSouth claims that the markups are recoverable because those figures are "normally computed costs," while Hinson asserts that BellSouth can only recover "losses" that are directly attributable to the excavator's negligence.

In its entirety, § 556.106(2)(a), Florida Statutes, reads:

> If a person violates s. 556.105(1) or (6), and subsequently, whether by himself or herself or through the person's employees, contractors, subcontractors, or agents, performs an excavation or demolition that damages an underground facility of a member operator, it is rebuttably presumed that the person was negligent. <u>The person, if found liable, is liable for the total sum of the losses to all member operators involved as those costs are normally computed.</u> Any damage for loss of revenue and loss of use may not exceed $500,000 per affected underground facility, except that revenues lost by a governmental member operator whose revenues are used to support payments on principal and interest on bonds may not be limited. Any liability of the state and its agencies and its subdivisions which arises of this chapter is subject to the provisions of s. 768.28.

Fla. Stat. § 556.106(2)(a) (emphasis added). While many terms included in the above-quoted section are defined in the statute, the terms "loss," "losses," "costs,"

and "normally computed" are not.

As an initial matter, Florida precedent binds the Court on this state-law issue. "In rendering a decision based on state substantive law, a federal court must 'decide the case the way it appears the state's highest court would.'" See Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F.3d 1285, 1290 (11th Cir. 2001) (quoting Royal Ins. Co. of Am. v. Whitaker Contracting Corp., 242 F.3d 1035, 1040 (11th Cir. 2001)). "Where the state's highest court has not spoken to an issue, a federal court 'must adhere to the decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise.'" Id. (quoting Ins. Co. Of N. Am. v. Lexow, 937 F.2d 569, 571 (11th Cir. 1991)). Unfortunately, the parties have not cited, and the Court has not found, any Florida precedent concerning this issue.[3] Thus, the Court turns to recognized principles of statutory interpretation.

---

[3] The Court has only found one case remotely touching on the issue. See Southland Construction, Inc. v. Greater Orlando Aviation, 860 So.2d 1031 (Fla. 5th DCA 2003). In that case, an excavator sued a utility for attorney's fees and an increase in its worker's compensation premiums arising from an excavation accident. Id. at 1033. The Court concluded that those damages were too remote from the injury to be recovered. Id. at 1036. In doing so, the Court rejected, for procedural reasons, an argument that the Damage Prevention Act allowed recovery of those damages:

> Southland contends that because the legislature has imposed liability under the Act on those who violate this act for the total cost of any loss incurred, such "total cost" should include insurance premiums. Unfortunately, Southland did not allege the applicability of the Act or violations of the Act in its complaint, or refer to it in any way in the complaint. Thus, there is simply no basis in the pleadings to find a claim under the Act.

### 1. The Plain Language of the Act

If a statute is clear and unambiguous, the Court must give effect to its plain meaning.  See <u>Birnholz v. 44 Wall Street Fund, Inc.</u>, 880 F.2d 335, 341 (11th Cir. 1989) ("[T]he cardinal rule of statutory construction is that when the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory construction; the statute must be given its plain and obvious meaning . . . .").  "'When the statute is clear and unambiguous, courts will not look behind the statute's plain language for legislative intent or resort to rules of statutory construction to ascertain intent.'"  <u>See</u> <u>Belanger v. Salvation Army</u>, 556 F.3d 1153, 1154 (11th Cir. 2009) (quoting <u>Daniels v. Florida Dept. of Health</u>, 898 So. 2d 61, 64 (Fla. 2005)) .

BellSouth argues that it is allowed to recover its indirect expenses, including the Corporate Overhead and Claims Processing expenses, because it uses a generally accepted cost-allocation method, thereby satisfying the Act's requirement that allows recovery of "losses . . . . as those costs are normally computed."  Hinson argues that "losses" is a limiting word and "if BellSouth's 'costs' are not 'losses' under Florida law, they may not be charged regardless of how they are computed."  (Doc. 64 at 14.)

Perhaps these differing interpretations show that the plain language of the statute is somewhat ambiguous.  However, insofar as "losses" and "costs" have

<u>Id</u>. at 1037.  This case is discussed further <u>infra</u>.

different meanings, the Court believes that plaintiff has the better argument. The Act does not read, for instance, that Hinson is liable for "losses and normally computed costs." Neither does the Act provide that BellSouth is entitled to "complete and appropriate reimbursement of the total sum of its costs related to the damage claim." (Doc. 68-2 at 7.) Instead, the statute's language strongly implies that the legislature intended the words "losses" and "costs" to mean essentially the same thing, allowing the recovery of losses "as <u>those</u> costs are normally computed." (emphasis added). BellSouth's contention that the use of the term "costs" somehow enlarges the scope of recovery available to member operators finds no support in the statute.[4] Nevertheless, to the extent that reasonable minds can differ, the Court will use other methods of statutory construction to test the Court's initial interpretation.

### 2. Intrinsic Aids to Interpretation

When part of a statute is ambiguous, the Court must first turn to intrinsic aids to interpret the meaning of any ambiguity. <u>See</u> <u>Lowery v. Ala. Power Co.</u>, 483 F.3d 1184, 1204 (11th Cir. 2007). Initially, the Court must construe the statute in a way that gives effect, if possible, to each word of the clause. <u>See</u> <u>Jaggernauth v. U.S. Atty. Gen.</u>, 432 F.3d 1346, 1354 (11th Cir. 2005). Using definitions supplied by Webster's Ninth New Collegiate Dictionary, BellSouth argues that the phrase "total

---

[4] Accordingly, that BellSouth's cost allocation accounting methodology has been approved by various public entities in other contexts is not relevant to the Court's analysis.

sum of the losses . . . as those costs are normally computed" must mean that the BellSouth can recover "'the whole amount: AGGREGATE' of BellSouth's costs." (Doc. 74 at 6.)  Further, BellSouth asserts that it must be allowed to recover the "claims processing" expense because "[e]ven if that cost is not viewed as a cost of repair, it is a component of the 'sum' of the loss that was indisputably incurred as a result of the damage."  Id.  While Hinson disagrees with BellSouth's construction, it fails to supply another interpretation that is logically sound yet addresses the legislature's choice of language.

However, an analysis of the full statutory language provides a more reasonable interpretation than that suggested by BellSouth.  Unredacted, § 556.106(2)(a) provides that an excavator, if found liable, is liable "for the total sum of the losses <u>to all member operators involved</u> as those costs are normally computed." (emphasis added).  This phrase is necessary because an excavator may damage the underground facilities of more than one member operator in the course of a single excavation.  Anticipating this occurrence, the Act simply provides that the excavator is liable for the "total sum" of those losses.  Contrary to BellSouth's argument that the term "total sum of the losses" means anything that can conceivably be characterized as a business cost to a single member operator, this phrase instead means that the excavator is liable for "losses" to all member operators resulting from the excavator's negligence; added together, those equal "the total sum of all losses."  BellSouth's

12

suggested interpretation fails because it does not to give effect to every word of the clause, mistakenly seeking to replace "the losses" with "its losses."

Additionally, BellSouth attempts to support its argument through the doctrine of *inclusio unius est exclusio alterius* ("the inclusion of one is the exclusion of the other"). See United States v. Fleet, 498 F.3d 1225, 1228 (11th Cir. 2007); see also Russello v. United States, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation omitted). While not invoking this doctrine by name, BellSouth argues that by including the phrases "total sum of all losses" and "costs as normally computed" in the part of the statute regarding the liability of excavators but omitting that language in the section of the statute regarding the liability of member operators, the legislature intended a greater recovery for utilities. See Fla. Stat. § 556.106(3).

That section relied on by BellSouth reads:

> If, after receiving proper notice, a member operator fails to discharge a duty imposed by the provisions of this act and an underground facility of such member operator is damaged by an excavator who has complied with the provisions of this act, as a proximate result of the member operator's failure to discharge such duty, such excavator shall not be liable for such damage and the member operator, if found liable, shall be liable to such person for the total cost of any loss or injury to any person or damage to equipment resulting from the member operator's failure to comply with this act.

Id. (emphasis added).  BellSouth asserts that this portion of the Act, by not including

the same language as in § (2)(a), evidences the legislature's intent to provide a lesser

remedy to excavators than that provided to member operators.[5]  BellSouth also states

that this language is "further evidence that the 'normally computed" language allows

a utility to use its normal methodology to calculate costs . . . ."  (Doc. 74 at 7.)

However, the more rational reason for the difference is that seldom will a

member operator's failure to follow the statute result in injury to more than one

excavator.  The legislature recognized this by stating that a member operator is liable

to "such person" instead of "such persons."  Thus, the legislature's choice of language

in § 106(3) is logically consistent with the statute as a whole because there is typically

only one entity that has been damaged and no "total sum of the losses" to compute.

Contrary to BellSouth's assertion, the difference between the two provisions is not

evidence that the legislature intended a greater remedy for member operators than

excavators.

---

[5] Interestingly, excavators have argued that this section allows for a more expansive recovery than might be immediately apparent from the section's plain language.  See Southland Construction, Inc., 860 So.2d at 1037.  The court in Southland determined that the statute does not allow excavators to recover an indirect insurance premium increase or attorney's fees claim, reasoning that "[t]he statute speaks of 'any loss or injury to any person or damage to equipment.'  This statutory language seems at most to contemplate personal injury damages, out-of-pocket losses and economic losses that are confined to damage to equipment."  Id.

### 3. Legislative History

While not necessary in light of the above conclusion, reference to the Act's legislative history supports the Court's interpretation. See Lowery, 483 F.3d at 1205 ("Though . . . it is error to cloud the plain meaning of a statutory provision with contrary legislative history, where, as here, the legislative history comports with the interpretation that has been adopted, and where there is a potential that others may find ambiguity where we have found plain meaning, caution and completeness counsel that we discuss the statute's legislative history."). Here, both the House and Senate issued "staff analysis" reports that bear on this issue. In Florida, these reports are accepted aids to statutory construction used to help determine legislative intent. See Am. Home Assurance Co. v. Plaza Materials Corp., 908 So.2d 360, 369 (Fla. 2005); see, e.g., Cooper v. Dillon, 403 F.3d 1208, 1220 (11th Cir. 2005); see also Rhodes & Seereiter, The Search for Intent: Aids to Statutory Construction in Florida – an Update, 13 Fla. St. U. L. Rev. 485, 494 (1985) ("[T]he staff analysis is the committee report most often relied upon by Florida courts.").

The House report, under "Substantive Analysis: Effect of Proposed Changes," states that "[d]amages shall be for losses to all members as those costs are normally computed." See House of Representatives Committee on Business and Professional Regulation Final Bill Analysis & Economic Impact Statement dated April 16, 1993, at 3. In the "Section-By-Section" analysis, the report states that Section 6 makes

15

violators "liable for losses as damages are normally computed." See id. at 5. The pertinent part of the Senate report states that "violators are liable for losses as damages are normally computed." See Senate Staff Analysis and Economic Impact Statement, dated February 26, 1993, revised March 1, 1993. This suggests two things: (1) that the legislature used the terms "costs," "losses" and "damages" interchangeably; and (2) there was no intention to institute a different remedial scheme, available only to the owners of underground facilities, than that available at common law.[6]

BellSouth claims that a separate portion of the legislative history supports its argument that the legislature intended for the Act's remedies to supplant those available at common law. The portion cited by BellSouth reads:

> Current law makes no provision for a statewide organization dedicated to reducing injury, death and monetary loss caused by excavation and demolition operations that . . . damage all facilities installed underground. . . . Huge monetary losses are caused by cutting a fiber optic facility that routinely carries massive volumes of telecommunications messages.

See House of Representatives Committee on Business and Professional Regulation Bill Analysis & Economic Impact Statement dated April 16, 1993 at 2 (emphasis added). The argument that this portion of the statute implies anything about what damages a member operator can recover under the Act is unmeritorious. To

_____

[6] This analysis is from the reports analyzing the final drafts of the bill; therefore, BellSouth's criticism of Hinson's legislative history analysis is inapplicable.

understand why this is so, the Court will delve into the Act's details.

The Act formed a non-profit corporation named "Sunshine State One-Call of Florida, Inc. ("One-Call") to administer a telephone notification system for the benefit of both excavators and member operators. Fla. Stat. § 556.103, 556.104. One-Call provides member operators the opportunity to locate and mark their underground facilities before excavation activity begins. Under the Act, every excavator must provide notice of its activities through One-Call not less than two days before commencing excavation. Fla. Stat. § 556.105(1). Excavation should not begin until: (1) each member operator underground facility has been marked and located; (2) the excavator is notified that there are no underground facilities in the location; or (3) two business days have passed. Fla. Stat. § 556.105(6)(a). If, after commencing excavation, an excavator does make contact with or damages an underground facility, the Act requires the excavator to immediately notify the member operator and stop activities that could cause additional damage. Fla. Stat. § 556.105(12).

The penalties for violating the Act ensure that it is in the best interest of all parties to strictly follow these the Act's procedures. If an excavator violates the Act and damages the underground facility of a member operator, "it is rebuttably presumed that the person was negligent. The person, if found liable, is liable for the total sum of the losses to all member operators involved as those costs are normally computed." Fla. Stat. 556.106(1)(a). If a member operator fails to discharge a duty

17

imposed by the Act and an excavator damages its property as a proximate result of that failure, the excavator is not liable for the damage "and the member operator, if found liable, shall be liable to such person for the total cost of any loss or injury to any person or damage to equipment resulting from the member operator's failure to comply with this act." Fla. Stat. § 556.106(3). If One-Call fails to discharge its duty and damage results, "the [One-Call] system, if found liable, shall be liable to all parties, as defined in this act." Fla. Stat. 556.106(5). The Act also creates a scheme of non-criminal infractions. See generally Fla. Stat. § 556.107

Thus, the Act seeks to prevent damage from occurring at all through the use of One-Call. The first purpose of the Act is damage prevention, not damage recovery. Seen in this light, the legislature's use of the term "huge monetary losses" is understandable because the legislature is using those losses to justify the creation of the One-Call system. Accordingly, the legislative history cited by BellSouth has little to do with the remedies available to a utility in the event of an excavator's failure to follow the statutory scheme, which is the only pertinent issue in this case.

After carefully considering the plain language of the statute along with intrinsic and extrinsic aids to statutory construction, the Court holds that the Damage Prevention Act does not provide BellSouth with any additional remedies or damages

other than those available at Florida common law.[7]

### b. Liability under Florida Common Law

While this ruling deals with the main arguments of the parties, it does not decide all of the issues in this case. Questions remain. Would Florida common law allow recovery of all or part of the disputed overhead expenses? Does the question of whether these expenses are recoverable simply present a question for the jury under common law or are they resolvable as a matter of law? The Act speaks in terms of recovery by BellSouth in a negligence action against Hinson. However, here BellSouth invoiced Hinson, Hinson paid and now seeks recovery for the alleged overpayment. Does that affect how the issue would be tried? Who would have the burden of proof as to whether these expenses are properly recoverable? What is the nature of this action–does it sound in contract or tort, or does it matter? How does the issue of whether BellSouth's "bill" to Hinson, which on its face does not disclose the disputed expenses, is deceptive fit into the case? Should the Court now address class certification?[8]

_____

[7] Of course, the Act does benefit BellSouth in this situation by creating a rebuttable presumption of negligence due to Hinson's apparent failure to follow the Act's notification procedures.

[8] The Court would expect plaintiff to submit a trial plan with its motion to certify a class. The Eleventh Circuit recently outlined the benefits to such an approach.

> [T]he proposal of a workable trial plan will often go a long way toward demonstrating that manageability concerns do not excessively

19

The Court is uncertain as to the answers to these and other related questions and will seek further guidance from the parties.

### c. BellSouth's defenses as to Hinson's claim

BellSouth has also filed a separate summary judgment motion against Hinson individually (as opposed to a dispositive motion that would apply classwide).  In this motion, BellSourth asserts: (1) Hinson's claim is barred by the voluntary payment doctrine; (2) Hinson's claim is barred by accord and satisfaction; (3) the acts complained of by Hinson are not "trade or commerce" within the meaning of FDUTPA; and (4) Hinson failed to state a claim for fraud as a matter of law.  (Doc. 46.)

The existence of genuine issues of material fact preclude summary judgment on these issues.  Examining the facts in the light most favorable to the non-moving party, Hinson was unaware of the Corporate Overhead and Claims Processing expenses included in BellSouth's bill.  This lack of knowledge, if credited by the jury,

_____

> undermine the superiority of the class action vehicle.  Moreover, there is a direct correlation between the importance of a realistic, clear, detailed, and specific trial plan and the magnitude of the manageability problems a putative class action presents.  We therefore recommend that district courts make it a usual practice to direct plaintiffs to present feasible trial plans, which should include proposed jury instructions, as early as practicable when seeking class certification.

Vega v. T-Mobile USA, Inc. 564 F.3d 1256, 1279 n. 20 (11th Cir. 2009).  A close examination of plaintiff's proposed trial plan in this case (alongside any responsive submission filed by defendant) may answer many of the questions posed by the Court.

would defeat BellSouth's "voluntary payment" affirmative defense. <u>See</u> <u>Hall v. Humana Hosp. Daytona Beach</u>, 686 So.2d 653, 657 n.7 (Fla. 5th DCA 1996) (citing <u>Jefferson County v. Hawkins</u>, 2 So. 362, 365 (Fla. 1887)). Similarly, accord and satisfaction is not applicable here because Hinson's payment was not a compromise of a disputed amount. "Discharge of a claim by accord and satisfaction means a discharge by the rendering of some performance different from that which was claimed as due and the acceptance of such performance by the claimant as full satisfaction of his claim." <u>See</u> <u>Jacksonville Elec. Authority v. Draper's Egg and Poultry Co.</u>, 557 So.2d 1357, 1358 (Fla. 1990). Taken in the light most favorable to Hinson, the facts show that BellSouth originally and erroneously billed Hinson for seven days of the contractor's sign fees, when Hinson was only responsible for two days. (Allen Aff. ¶¶ 19-22.) Hinson's successful challenge to that amount, and subsequent payment in full of the second bill, cannot be an accord and satisfaction of the corporate overhead and claims processing charges disputed in this lawsuit. As to BellSouth's claim that Hinson's fraud claim fails as a matter of law, that claim has been pled and supported sufficiently to survive summary judgment; the factual questions upon which BellSouth's arguments rest are for the jury, not the Court.

BellSouth's final claim is that the events upon which this lawsuit are based do not meet the definition of "trade and commerce" under FDUTPA. While the undersigned rejected a similar argument at the motion to dismiss stage, it was not

without some trepidation. However, as pointed out by BellSouth, no Florida precedent has squarely addressed a scenario falling outside of "trade or commerce." In the Order denying BellSouth's Motion to Dismiss, the Court reasoned that "[i]t is undisputed that BellSouth is generally involved in the offering of telecommunications services to the general public. Furthermore, the maintenance and repair of underground cables would seem to be an integral part of BellSouth's business." (Doc. 33 at 7.) Given the broad definition of "trade and commerce" in the statute, the Court will deny BellSouth's motion for summary judgment on this ground as well. It is hereby

**ORDERED:**

1. Defendant BellSouth's motions for summary judgment (Docs. 46, 62) are **DENIED**.

2. Plaintiff Hinson's Motion for Partial Summary Judgment (Doc. 64) is **GRANTED IN PART** as stated in this Order.

3. Defendant BellSouth's Motion to Strike Portions of Errata Sheet of Warren G. Fischer (Doc. 67) is **DENIED**; BellSouth can certainly address the discrepancy between Mr. Fischer's original deposition testimony and the written errata sheet at trial.

4. The parties should confer and either file a joint statement or file separate position statements of no more than five pages, addressing by what mechanism the

Court should resolve the questions raised on page 19 and otherwise how to proceed.

The joint or separate statements must be filed no later than **August 13, 2009**.

      **DONE AND ORDERED** at Jacksonville, Florida, this 13th day of July, 2009.

TIMOTHY J. CORRIGAN
United States District Judge

jcd.

Copies to:

Counsel of Record